...case, which is Mathin v. Kerry. The lawyers were good. Wonderful. Wonderful. Yeah, the lawyers were good. Extraordinary. Well, they listened to the question. They listened to the question. And they were very... Pardon? I thought they were extraordinarily clear and... Money buys good lawyers. Sometimes. Not always. Are you sure you all want to stay? Everyone's leaving. Oh, wait a minute. You're getting reserves. Oh, the reserves are coming. Okay, so our next case, Mathin v. Kerry, Mr. Burton. Thank you, Judge. May it please the Court, my name is Justin Burton. I'm here on behalf of Mr. Abdel-Mathin on a direct appeal of a petition for declaration and a request for an order from the lower court that he is indeed born or was born here in the United States. Just as a question, he lives in the United States, isn't that correct? He does live in the United States. Is there any question about his being permitted to remain here? Not at this point. We had discussions about it with the State Department. And the State Department, unfortunately, they can't move to remove him because they have no proof that he was born elsewhere. And so there is consideration at a certain point whether they, and perhaps Ms. Young can speak to this as well, they had or were able to establish by and through a removal document that they can actually sustain their burden by showing by clear and convincing evidence that he is removable from the United States. But he's not like one of these stateless people that has to live in the airport. Correct. He actually has been leaving the United States and coming back into the United States. And when he does leave the United States and typically gets through Canada, he's always asked at the border when he comes in, where are you from? And he says, I'm from the United States. And they say, well, let me see documentation. And that leads us to what our problem is here today, is that he has no documentation. So how does he get in? Apparently at this point, I think the CBP officers at the... They know him? They know him at this point. He's done it so often that they know the issue at hand. And I think probably at some point years ago they perhaps had called the State Department and asked, who is Mr. Abdul-Mateen and what's going on here? And so there apparently was some background investigation run, and they keep letting him into the United States. And he is a landed immigrant in Canada. He needed some sort of fallback to be able to establish some sort of tie somewhere in the world. I think, Your Honor, you may have a point. I think at this point he is stateless. He isn't a citizen of India. He isn't a citizen of Canada. And right now we have no proof that he was born in the United States. Well, we have proof that he was born in the United States. We don't have an order directing him that he was born in the United States for the State Department to issue a passport. And that's where he's found himself over the past 20 years of dealing with the State Department, dealing with investigators, dealing with securing documentation to establish his burden of proof. And the burden of proof in this case is by a preponderance of the evidence. And it's a very fact-intensive inquiry in determining whether Mr. Abdul-Mateen established that he was born in the country. Of course, Abdul-Mateen doesn't know himself whether he was born in the United States. He heard his parents talk about it when he was 13 years of age. When he was a little bit older, he found out more information from aunts. Or perhaps when he was 13, he found out by his aunts. And then he was able to come into the United States in 1988 and try and establish some sort of ties here to find out where he was actually born. He did the bulk of his own investigation and work in being able to establish that he was born in the United States. But would you concede that the possession of an Indian passport creates presumption that he's an alien? No, not in this particular case. I think it will go towards how he got the passport and why he got the passport initially. His parents, he was tied into his mother's passport when he was a very young child like many other born nationals who travel in and out of the United States or any other country on their parents' mother or father's passport. You're looking at one. Right. And my grandparents, and I'm sure most of everybody's grandparents or parents have done this in the past. So that being said, when it came his turn to get his passport when he traveled to Hong Kong when he was 13 years old and he needed a new passport, he then went into the passport agency, whatever the Indian government has over there, because it's very convoluted, I think, how somebody actually obtains a passport in India. And he went in and said, I need a passport. They gave him this passport and said, here you go. Here's your passport. It says you're Indian, you're born in India. Go ahead to Hong Kong. And it wasn't until really he was in Hong Kong where he had this desire to eventually come to the United States and figure out his birth country to establish these ties. I want to get this in, and I'm afraid it's going to leave my head. Could he have gained citizenship by virtue of his marriage? He could have. And he could have done that a long time ago. He could have done that through his father-in-law, who had filed a petition for his wife in 1991 or 92. His wife eventually secured a permanent residency. He has two United States citizen children. Even now they could have petitioned for him. And so there's ways for him to secure his lawful permanent residency. He insists, why do I need that step? Why do I need to be bound to rules of minimus ability and deportability and other things that the Immigration Act might require if I was born in the United States? So he refused all that time to go through the route of securing permanent residence status in the United States. Instead, he went to the state of Illinois where people go. Could he still ask for adjustment of status based on his marital situation? I think he can. I think there's major steps that we have to overcome to be able to secure that status. But I think in the end, Mr. Abdul-Mateen can convince the Immigration Service, look, I truly believe that I was born in the United States. I can still get my green card even though I allegedly falsely claimed that I was a citizen of the United States. It was under the firm belief he was born here. So there are difficulties in the case, but I think ultimately he can secure his permanent residence status. Is there any dispute that the marriage certificate did not in fact include his birthplace and that the translated version that was submitted for the delayed birth certificate falsely indicate his birthplace is the United States? There is dispute. I've never seen, and Mr. Abdul-Mateen has never seen, the license or the marriage certificate that the State Department received from overseas. We've never had a chance to see this document. The only way it was ultimately brought in was through this investigation that the State Department ran through Mr. Hammond, who said that he spoke to somebody at a United States consulate who spoke to somebody who went to the marriage license facility or whatever India has. Have you asked for it? We brought it up a couple times, and the State Department indicated this is all the documents that they had in our possession, which is all the documents were fairly difficult to receive. There are still missing documents from the initial investigation from Scott Boltovich, which included the initial marriage license, which he used to get the delayed Illinois birth certificate. Again, they came back with, this is all the documentation which we have. Principally, there were a number of documents which Mr. Abdul-Mateen used to establish his birth in the United States. Most notably is the Illinois delayed birth certificate, which he used two documents to secure that, this marriage license which you just spoke about, and an affidavit from a person named Judith Roper. What happened when Mr. Abdul-Mateen moved forward with trying to get that passport in 1996 is that when the State Department ran this investigation, they had full access to Judith Roper. Abdul-Mateen provided the State Department with her name, and investigators the name, telephone address of her, and also this other person who provided an affidavit, Nielsen, Thomas Nielsen. The investigator in 1996 failed to talk to Mr. Nielsen, failed to talk to Ms. Roper, but instead spoke to her roommate. The problem is, I think the document itself, the report, which now in 2011, 2012, the State Department used as a basis to come up with their own determination as to whether fraud was committed, is unreliable. For the State Department report to be admissible, it must be trustworthy, it must be reliable. And there's a way to authenticate the report to submit in the evidence, and there's four requirements to be able to do that. The investigation must be timely, the investigator's skill or expertise must be there, a hearing must be held, and also there's a possibility, and we'd have to show a possibility of bias when the reports were prepared. We would argue that the investigator's skills were wholly lacking in this case. There was a number of mistakes that were made by Scott Bolchevich's investigation, which were then adopted in 2011 in the State Department's own investigation. The problem is, and I don't want to say necessarily they backdoored Florence Neal's testimony and their own opinion into evidence, but that's ultimately what they did. They ignored, at least the State Department in the later reports, ignored that the reliance on the determination of fraud was based on a communication with a landlord or a roommate who Judith Roper no longer lived with. They also relied on this marriage license from overseas, which none of us have really ever seen. So it brings doubt on the 2011 State Department report, which then relied on the 1996 report, and all of it should have been thrown out. So really what we have is the Illinois Delayed Birth Certificate, the testimony of Abdulmateen and Zayuddin, the affidavits from Thomas Nielsen, and the affidavit from Judith Roper. I think the lower court erred also in excluding Exhibits 3 through 6, and there is some controversy as to whether they were excluded or whether they were provided diminished right. Reading the decision three or four or five or six or ten times now it looks like it was excluded, and there's no indication that the lower court even offered it less weight or any weight whatsoever. The government's brief seems to think that all affidavits provided some weight. In this case, 3 through 6 were not. And it's crucial for Mr. Abdulmateen, who has no way of independently verifying through U.S. government documents that he was born in the United States. The only way he can do this is through affidavits and testimony to be able to establish that he was born in the United States. Lastly, I want to touch on the credibility determinations. We do think that the lower court's decision was lacking in the credibility determinations. Of course, his father, who's really the only person alive that witnessed the birth, was there to bolster his son's claims. That's what a witness does. And he wasn't lying. I don't think it was properly taking into consideration his age and his health. He was confined to a wheelchair. He was able to stand up and go use the restroom during the deposition, but short of that, he was bound to a wheelchair. He certainly had memory issues, but he unequivocally stated that his son was indeed born in the United States when his wife and him were here. Was there any evidence presented from his five living siblings as to what the family history was? There wasn't, and there seems to be some understanding that there may have been some estrangement between him and the siblings. And so the siblings didn't have any direct knowledge of where he was born, so we didn't even bring that into exhibits. I was thinking about family lore. Sure, sure. All right, I'd like to reserve the rest of my time. Thank you. Thank you, Mr. Burton. Ms. Young? Good morning, Your Honors. May it please the Court, Stacy Young for the government. When an individual seeks a declaration of citizenship under 8 U.S.C. 1503, the burden of proof by a preponderance of the evidence is squarely on the applicant to demonstrate that he was born in the United States. Here, the District Court did not commit clear error in finding that Muhammad Abdul-Mateen failed to meet his burden. But did the District Court, I mean, did the District Court require too high a standard when, you know, it emphasized that he failed to present testimony of an expert or a witness with knowledge of those documents' age? I mean, she dismissed the affidavits of his parents that were allegedly created in 1966. Was, I mean, isn't witness testimony unlikely to be available in a case like this involving documents that are that old? Should we require expert testimony as a matter of course, do you think? Your Honor, I don't think that the District Court judge required each individual who alleged to have been present at the birth to be present in court to testify to that fact. The District Court judge did apply the correct burden. She explicitly found that it is Mr. Mateen's burden to demonstrate that he was born in the United States, and she did carefully review each and every piece of evidence that both the government and Mr. Mateen presented with respect to the old affidavits you're referring to. I believe you're referring to the parents' affidavits in 1966, for example. The District Court judge did, I think, correctly find it spurious that these two affidavits from the parents suddenly appeared in the year 2007. And with respect to the contents of the affidavits, they contain no information about why they were created. Mr. Mateen's father, Z.U. Dean, actually did testify to the affidavits, and when asked why they were created, he first testified that he and his wife did so to get Mr. Mateen an Indian passport, which is curious because it wouldn't have helped him get an Indian passport to have been born in the United States. He later changed his answer to, I have no idea, and then he returned to his claim that they completed those affidavits so that Mateen could get an Indian passport, and finally changed his answer again to state that his goal was to get Mateen into school, which is another curious answer given the fact that Mr. Mateen was only nine months old when these affidavits were created. So there was testimony with respect to these affidavits, and it simply wasn't credible. You know, doesn't the fact that it sounds like he could bypass all of this because of his marriage, doesn't all of that lend some credibility to his efforts here? Because, you know, what's the incentive for him to go through this process unless he truly believes he was born in the United States? Well, Your Honor, there could have been any number of reasons why getting a visa, a green card, or another immigration document would have been difficult for him. He may have had issues with the law. He may have had other problems that would have... Sure doesn't sound like it, does it? There may have been problems that I'm simply not aware of. Is there any indication of legal problems? I'm not aware of any legal problems that would have posed problems for him, but I'm representing the State Department in this case, not DHS. And to be clear, you were asking earlier... No criminal charges or anything like that? I'm not aware of any criminal charges. Well, you would be aware. I'm not aware of any criminal charges, Your Honor. There may have been arrests that I'm unaware of. Certainly there was an arrest in 1996 concerning his application. He was arrested for passport fraud and investigated for that. There were no charges actually brought against him, but it was a thorough investigation, and the State Department did determine that he had committed passport fraud. But that's all tied up with all of this. It is, Your Honor. Apart from this. And one more thing I will add is that, according to Mr. Mathine, which he testified during trial, his visa, which allowed him to come to the United States in 1991, would have expired in 1996, and he only made his assertion to the State Department that he was entitled to a passport for the first time in 1996. That may have meant there was a period of time when he was out of status, and that period of time when he was out of status may have prevented him from, at that time, obtaining a green card. But, again, I can't speak to the actual immigration specifics with respect to why. But he could stay until, I don't quite understand it. He was able to stay until 1996? Correct. According to him, that's what he testified at trial, that he had a five-year visa of some sort that allowed him to stay in the country until 1996. And it was only in 1996, when he became out of immigration status, that, for the first time, he sought a U.S. passport. And I think that the timing of this is particularly telling. For the first time, he went to the government and first started asserting that he was a U.S. citizen, even though he claims that he first came to the United States in 1988 to do so. And he never once approached the government in those eight years until he was out of immigration status. I didn't, and maybe I missed it and didn't pay attention or haven't been close enough with observing. Is there any question about his Indian citizenship? Your Honor, his passport does state that he is an Indian citizen. Well, I understand that. I mean, there's nothing shaky about that. The government doesn't believe that there's any question that Mr. Mathien is an Indian citizen. So with respect to the earlier discussion about Mr. Mathien being stateless, the government would assert that he's not stateless. That was my point. That's not an issue. It's not an issue. Mr. Mathien has an Indian passport, which explicitly states that he was born in India. What does he do? For a living, Your Honor. He's involved in some kind of real estate business, I believe. Why does the government care? You're letting him live here. Well, Your Honor, he is living here at the moment. He is living here at the moment. But there doesn't seem to be. I mean, you say you may have arrests or something. You obviously haven't actually looked into his, you know, worthiness as an American, but I just wonder why one would bother with the litigation unless you thought this was a person who was, you know, harming the United States. Well, Your Honor, the U.S. government doesn't issue passports lightly, and it doesn't issue declarations of citizenship lightly. I don't know. It should seem pretty lightly to applicants, doesn't it? Well, the State Department has specific regulations that it must follow when an individual presents himself as a U.S. citizen. He must either present evidence that's primary, which would be a birth certificate issued in the United States within a year of his birth, or he must present secondary evidence, which includes such things as baptismal certificates, certificates of circumcision, medical school records. It's often very difficult to obtain a birth certificate. I mean, we've run into this with all these photo ID laws. People, to get a photo ID, they're told to produce their birth certificate. That's correct. And they have an awful lot of difficulty. I have none. People who are born outside of a hospital, apparently, find it almost impossible to get a birth certificate. You're correct, Your Honor. Many people don't get a birth certificate who were born in the United States, and that's why the State Department, under 22 CFR Section 5142, allows for secondary evidence if an individual doesn't have primary evidence, which would be a birth certificate. And that secondary evidence includes hospital birth certificates. It includes baptismal certificates, medical and school records, certificates of circumcision, and other documentary evidence created shortly after birth or affidavits from people with personal knowledge of the birth facts. Is this an unusual case? To be honest, it's an unusual case in Illinois. It's not an unusual case in the United States. There are many of these cases, for example, in states on the border. What's your theory of when he came to the United States? As to the timing of when he came to the United States? I believe that he did come in 1988 as he testified. How old was he? In 1988, I believe he would have been 23. So you think that's when he first came to the United States? I believe so, Your Honor, but I certainly can't say for sure. And his theory is that he was born here, but a few months later went back to India? He claims that a few weeks after he was born, his parents took him back to India. And then he came in 1988, is that it? That's correct. He claims that his parents flew to America, left his five children without their parents in India, while his mother was eight months pregnant. There's no indication that his parents actually came to the United States at that time. There are no immigration documents. Aren't there aviation records? You would think there would be plane records, correct, aviation records. You'd think that there would be immigration records. They would have had to get a visa to come to the United States. You would have thought that there would be some kind of indication on their passports at the entry of the United States. There are myriad ways in which they could have demonstrated that they did come to the United States in 1965, shortly before Mr. Mathine was born. Is there any indication as to why no one directly interviewed Judith Roper? Well, according to the IMS report from the State Department, the agent who was responsible for the investigation at the time did visit the home of Ms. Roper. Yeah, I know that. Apparently she wasn't home. I don't know exactly why she was never interviewed in 1996. The investigator in 2010 did attempt to reach her, but at that point she had apparently died. So there's no indication why she wasn't directly interviewed in 1996, but there was many pieces of evidence that the State Department, through both investigations, did acquire, and all of the evidence that it acquired pointed to the fact that Mr. Mathine, as his passport reflects, was indeed born in India. And the pieces of evidence that Mr. Mathine proffered both to the State Department during its investigation and through his passport applications is all spurious and none of it really passes the smell test. Each affidavit was created under curious circumstances. The individual who allegedly helped Mr. Mathine through this process spells his name differently on each document. Mr. Mathine proffered, his name actually differs on different documents. Sometimes it's Nelson, sometimes it's Nielsen. His story simply doesn't add up. He never went to the government directly to help Mr. Mathine, and he allegedly created an affidavit shortly after Mr. Mathine was born in 1965. However, if he really wanted to demonstrate that Mr. Mathine was born in the United States, he certainly could have helped the family obtain an actual birth certificate, which certainly would have been more definitive proof. And this is probably, again, something obviously I've missed. His name now is, okay. His name is still the same, Mohammed Abdul Mathine? Well, his name, according to the Nielsen or Nelson affidavit, was slightly different, but the government doesn't contend that Mr. Mathine's name And one more point I'd like to make. Your Honor indicated earlier that there's a question as to whether the State Department has not removed Mr. Mathine from the country. It's not the responsibility of the State Department to remove individuals who are unlawful aliens in this country. That authority rests solely with the Department of Homeland Security, specifically with the Immigration and Customs Enforcement. The fact that Mr. Mathine has not been removed from the country since he's been here during the time he's been here, unlawfully, since 1996, is not dispositive of anything. There are currently 12 million illegal aliens in the country, and the government can't remove all of them. And there's now actually a list of priorities in place that was issued several years ago. But you see, some things that may be viewed as tangential bother me. In other words, now that I've learned that it certainly sounds as if his marriage would have kept him here, you know, why would someone want to make himself basically a target by bringing a case like this? It just doesn't add up. The whole thing is a movie. It is a strange case, certainly, Your Honor. But as I mentioned earlier, the fact that it seems like he was out of immigration status in 1996 may have prevented him from getting a visa. There are numerous other reasons why he may not have wanted to have applied for a visa at that time. I certainly can't explain exactly why Mr. Mathine did what he did, but all we can do is examine whether he met his burden of proof in this case, and the burden is on him. And based on the facts that both parties presented in this case, he simply failed to meet that burden, and the district court, for this court to disturb that decision, would have had to commit clear error, which it didn't. And just to be clear, under the clear error standard, the decision to credit some testimony and some evidence over other testimony and other evidence can almost never be clear error, as the Seventh Circuit has found. Okay, well, thank you, Ms. Young. Mr. Burton? Thank you, Your Honor. Thank you. John? Thank you. Maybe I can clear up a couple issues. Mr. Abdul-Mathine came in the United States the last time in 19- well, on the visa in 1991. Visitor's visas, when you're admitted to the United States, you're only granted to be here for a six-month period of time, even back in the early 90s, even back in the 80s or 70s. The visa itself allows you to come and go in and out of the United States. Once you're here in the United States, it just doesn't permit you to remain here in the United States during the length of your entire visa. INS, INS at the time, would provide you an opportunity of staying here for six months on that visa. So Mr. Abdul-Mathine would have technically been out of status in 1991 until 1996. He could have received his green card just like his wife did, based off of being married to his wife as well. So I think the government seems to be fixated on he fell out of status, therefore, in 1996, therefore immediately started looking to determine whether he was a citizen of the United States or not. I think it kind of misses that he was actually out of status five years before, if indeed he was a foreign national. Your Honor, you asked if he had ever been arrested. Mr. Abdul-Mathine has not. In regards to the process that he was going through, the State Department, by and through their administrative officers, sounds like arrested him. There wasn't much evidence whatsoever that he was actually indeed arrested for it. They dismissed the charges. I find that particular or peculiar because if the State Department was going to charge him at that time, why wouldn't they go seek an affidavit or something from Judith Roper? Judith Roper, when apparently Scott Bolchevich, the State Department, went to go to her house, was on notice that she was in a convalescent home or a nursing home of some sort. It's not like she was mobile. It's not like she was on the run. She was present. She was able. A phone number was provided. An address was provided. They never looked into it. And I think that would have solved this whole puzzle here. And, yes, I think this is a peculiar case. It's the case of somebody who was born in the United States. It was somebody who came back to the United States to prove it. I don't think his parents ever dreamed that he would ever move to the United States and stay here the rest of his life. I think if they look back at it, they probably would have received documentation before they ever left here. Had he ever served in the military in India? Never has. Never has. He was in Hong Kong for a while, then from Hong Kong came to the United States. Would you mind discussing the roommate of Roper who said she saw money? Unfortunately, I don't know anything about her. The State Department reports seem to reflect what she had to say. We never had an opportunity to cross-examine her. I don't think she's still, as far as I know and what was told to me, she's no longer alive. So there's no way for me to find out what did Scott Poltravich ask her or what were the circumstances surrounding the inquiry into Judith Roper and how she saw it, what she in the room at the time or what she heard. I don't know this because I wasn't provided an opportunity to ask these questions. It should have been excluded. All of it should have been excluded. And that leaves us with what we have. We have affidavits. We have other documents in support of Mr. Abdul-Mateen being born in the United States. And I wish India worked in the same way the United States was where there was baptismal certificates and other certificates, school certificates showing that he was born in the United States. India just doesn't work that way. And I don't think it was properly considered at the lower court. Okay. Well, thank you, Mr. Burton and Ms. Young. And we'll move on to our last.